## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| POSITEC USA, INC. and RW DIRECT, INC.<br><br>Plaintiffs<br><br>v.<br><br>U.S. CUSTOMS AND BORDER PROTECTION; RODNEY S. SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection; and the UNITED STATES OF AMERICA<br><br>Defendants. | No. 25-00275 |

## COMPLAINT

1. Plaintiffs, Positec USA, Inc. and RW Direct, Inc. ("Plaintiffs"), are U.S.-based importers of merchandise subject to the duties challenged in this complaint.

2. Beginning in February of this year, through a series of executive orders, President Trump invoked the International Emergency Economic Powers Act ("IEEPA") as authority to impose new and substantial tariffs ("IEEPA duties") on goods imported from nearly every foreign country, including countries from which Plaintiffs sources its imports. Plaintiffs are responsible for paying these tariffs on their imported goods.

3. IEEPA does not authorize these tariffs. This Court and the Federal Circuit have already so held. *V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312 (Fed. Cir. 2025), *cert. granted*, No. 25-250, 2025 WL 2601020 (U.S. Sept. 9, 2025).

4. Through this action, Plaintiffs ask the Court to hold for it exactly what it and the Federal Circuit already held in *V.O.S. Selections*: that the IEEPA duties imposed by Defendants, and the underlying executive orders that directed them, are unlawful.

5. The Supreme Court heard oral argument in *V.O.S. Selections* and a companion

case arising out of the U.S. District Court for the District of Columbia[1] on November 5, 2025, and is expected to rule in the near future.

6. This separate action is necessary, however, because even if the IEEPA duties and underlying executive orders are held unlawful by the Supreme Court, importers that have paid IEEPA duties, including Plaintiffs, are not guaranteed a refund for those unlawfully collected tariffs in the absence of their own judgment and judicial relief.

7. And this action is necessary *now* because the entries for which Plaintiffs paid tariffs imposed under authority of IEEPA will begin to become liquidated and final as a matter of law by January 31, 2026. Plaintiffs seek relief from the impending final liquidations to ensure that their right to a complete refund is not jeopardized (and to that end intend to file a motion for a preliminary injunction to suspend liquidation).

8. Accordingly, for themselves, Plaintiffs seek (i) a declaration that the IEEPA duties are unlawful; (ii) an injunction preventing Defendants from imposing further duties on it under the executive orders challenged in this lawsuit; and (iii) full refund from Defendants of all IEEPA duties Plaintiffs have already paid to the United States as a result of the executive orders challenged in this lawsuit, as well as those it will continue to pay.

## PARTIES

9. Plaintiff, Positec USA, Inc., is a U.S. Company, incorporated in North Carolina.

10. Plaintiff, RW Direct, Inc., is a U.S. Company, incorporated in North Carolina.

11. Defendant United States Customs and Border Protection ("CBP") is a component agency of the U.S. Department of Homeland Security, headquartered in Washington, D.C. CBP

---

[1] *Learning Res., Inc. v. Trump*, 784 F. Supp. 3d 209 (D.D.C. 2025), *cert. granted before judgment*, No. 24-1287, 2025 WL 2601021 (U.S. Sept. 9, 2025).

is responsible for border security and collecting tariffs or duties and taxes on goods imported into the United States.

12. Defendant Rodney S. Scott is the Commissioner of CBP and is sued in his official capacity.

13. Defendant United States of America received the disputed tariffs and is the statutory defendant under 5 U.S.C. § 702 and 28 U.S.C. § 1581(i)(1)(B).

14. Defendants are referred to collectively in this complaint as "CBP".

## JURISDICTION

15. The Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1581(i) and 28 U.S.C. § 2631(i). *See V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312, 1334 (Fed. Cir. 2025), *cert. granted*, No. 25-250, 2025 WL 2601020 (U.S. Sept. 9, 2025).

16. The Court has the same powers at law, in equity, and as conferred by statute as a United States District Court. 28 U.S.C. § 1585. In a civil action under 28 U.S.C. § 1581, the Court can enter a money judgment against the United States and can order any other appropriate civil relief, including declaratory judgments, injunctions, orders of remand, and writs of mandamus or prohibition. 28 U.S.C. §§ 2643(a)(1), (c)(1).

17. Plaintiffs have standing to bring this lawsuit because they are the importers of record for goods imported into the United States from countries subject to the unlawful IEEPA duties as implemented and collected by CBP. As a result of the executive orders challenged by this lawsuit, Plaintiffs have paid IEEPA duties to the United States and thus have suffered injury caused by those orders. Declaratory and injunctive relief from this Court would redress those injuries. Plaintiffs also face imminent and irreparable harm because entries for which it paid IEEPA duties are anticipated to liquidate as early as December 15, 2025.

## GENERAL PLEADINGS

**I.      President Trump orders a series of tariffs, invoking IEEPA for his authority.**

    **A.      The IEEPA duties**

18.      On February 1, 2025, President Trump issued three executive orders imposing tariffs on imports from Canada, Mexico, and China. Each executive order was premised on IEEPA authorizing the tariffs, and for each set of tariffs President Trump claimed that they were justified under IEEPA because of a purported national emergency. Collectively, these are referred to in this complaint as the "Trafficking Tariff Orders."

19.      The executive order directed at Mexico, Executive Order 14194, 90 Fed. Reg. 9,117, *Imposing Duties To Address the Situation at Our Southern Border* ("Mexico Tariff Order"),[2] imposed an additional 25 percent tariff on the import of goods from Mexico. The President's claim of emergency powers was based on "the grave threat to the United States posed by the influx of illegal aliens and illicit drugs into the United States" and "the failure of Mexico to arrest, seize, detain, or otherwise intercept [drug trafficking organizations], other drug and human traffickers, criminals at large, and illicit drugs." *Id.*

20.      The executive order directed at Canada, Executive Order 14193, 90 Fed. Reg. 9,113, *Imposing Duties to Address the Flow of Illicit Drugs Across Our Northern Border* ("Canada Tariff Order"),[3] declared an emergency because of opioid trafficking, and also imposed a 25% tariff, with certain exceptions.

21.      Finally, the executive order directed at China, Executive Order 14195, 90 Fed.

---

[2] Exec. Order No. 14194, *Imposing Duties To Address the Situation at Our Southern Border*, 90 Fed. Reg. 9,117 (Feb. 7, 2025).
[3] Exec. Order No. 14193, *Imposing Duties To Address the Flow of Illicit Drugs Across Our Northern Border*, 90 Fed. Reg. 9,113 (Feb. 7, 2025).

Reg. 9121, *Imposing Duties to Address the Synthetic Opioid Supply Chain in the People's Republic of China* ("China Tariff Order"), also declared an emergency because of opioid trafficking, declaring that the "sustained influx of synthetic opioids" was a national emergency and that "[m]any PRC-based chemical companies also go to great lengths to evade law enforcement and hide illicit substances in the flow of legitimate commerce."[4] The President's claim of emergency powers was based on "the grave threat to the United States posed by the influx of illegal aliens and illicit drugs into the United States" and "the failure of the [People's Republic of China] government to arrest, seize, detain, or otherwise intercept chemical precursor suppliers, money launderers, other [transnational criminal organizations], criminals at large, and drugs." *Id.*

22. The China Tariff Order imposed an additional 10% *ad valorem* tariff on products from China imported into the United States on top of existing duties.

23. Four days later, on February 5, 2025, the President issued another order, Executive Order 14200, *Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China* ("February 5 Amendment").[5]

24. The next month, on March 3, 2025, the President amended the China Tariff Order again through Executive Order 14228, 90 Fed. Reg. 11,463, *Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China* ("March 3 Amendment").[6] The March 3 Amendment raised the incremental tariffs on imports from China to 20% and justified this increase by claiming that "the PRC has not taken adequate steps to

---

[4] Exec. Order No. 14195, *Imposing Duties to Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9,121 (Feb. 7, 2025).
[5] Exec. Order No. 14200, *Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9277 (Feb. 11, 2025).
[6] Exec. Order No. 14228, *Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 11,463 (Mar. 7, 2025).

alleviate the illicit drug crisis."

25.     On April 2, 2025, citing trade deficits with our trading partners as its own national emergency, President Trump issued Executive Order 14257, 90 Fed. Reg. 15,041 ("Reciprocal Tariff Order"), *Regulating Imports with a Reciprocal Tariff to Rectify Trade Practices that Contribute to Large and Persistent Annual United States Goods Trade Deficits.*[7] The Reciprocal Tariff Order imposed a 10% baseline tariff on nearly all imports to the United States, effective April 5, and additional "reciprocal" tariffs on 57 countries, effective April 9. *Id*. at Annex I. These higher country-specific tariffs range from 11% to 50%. *Id*.

26.     The Reciprocal Tariff Order asserts that "U.S. trading partners' economic policies … suppress domestic wages and consumption, as indicated by large and persistent annual U.S. goods trade deficits." *See* Reciprocal Tariff Order.

27.     On April 8, 2025, the President responded to retaliatory tariffs from China by raising the reciprocal tariff rate on China by 50 percentage points—from 34% to 84%. Exec. Order No. 14,259, 90 Fed. Reg. 15,509, *Amendment to Reciprocal Tariffs and Updated Duties as Applied to Low-Value Imports from the People's Republic of China*.[8]

28.     The next day, the President suspended for 90 days the higher country-specific tariffs on all countries except for China, for which he raised the "reciprocal" tariff again—from 84% to 125%. Exec. Order No. 14,266, 90 Fed. Reg. 15,625 (Apr. 9, 2025), *Modifying Reciprocal Tariff Rates to Reflect Trading Partner Retaliation and Alignment*.[9] Meanwhile, the 20% trafficking tariff on imports from China remained in place, such that most imports from

---

[7] Exec. Order No. 14257, *Regulating Imports With a Reciprocal Tariff To Rectify Trade Practices That Contribute to Large and Persistent Annual United States Goods Trade Deficits*, 90 Fed. Reg. 15,041 (Apr. 7, 2025).
[8] Exec. Order No. 14259, *Amendment to Reciprocal Tariffs and Updated Duties As Applied to Low-Value Imports from the People's Republic of China*, 90 Fed. Reg. 15509 (Apr. 14, 2025).
[9] Exec. Order No. 14266, *Modifying Reciprocal Tariff Rates To Reflect Trading-Partner Retaliation and Alignment* (Apr. 9, 2025) 90 Fed. Reg. 15625 (Apr. 15, 2025).

China faced a minimum 145% IEEPA tariff.

29. In implementing his Executive-Order-based tariff regime, the Defendant directed changes to the Harmonized Tariff Schedule of the United States, requiring that goods subject to the challenged tariffs to be entered under new tariff codes.

30. On April 14, 2025, several companies filed an action in this Court challenging the legality of these tariff orders. *See V.O.S. Selections*, *et al. v. Donald J. Trump, et al.*, No. 25-cv-00066 (Dkt. 2). As discussed below, this Court held the orders were unlawful and the Federal Circuit, sitting *en banc*, affirmed.

31. In the months since the *V.O.S. Selections* complaint was filed, President Trump, invoking IEEPA, has issued additional executive orders imposing additional tariffs and modifying others. As explained below, IEEPA does not authorize the President to impose tariffs. By this complaint, however, Plaintiffs challenge only those orders the Federal Circuit has already held to be unlawful ("Challenged Tariff Orders").

### B. CBP's implementation of the unlawful tariffs

32. CBP is charged with the assessment and collection of duties, including the IEEPA duties. *See* 19 U.S.C. §§ 1500, 1502.

33. In 1988, Congress enacted the Omnibus Trade and Competitiveness Act of 1988, which adopted the new tariff nomenclature: the Harmonized Tariff Schedule of the United States ("HTSUS"). Pub. L. No. 100–418, 102 Stat. 1107 (1988). CBP classifies merchandise imported into the United States consistent with the HTSUS, which sets out the tariff rates and statistical categories using a series of nested chapters, headings, and subheadings. 19 U.S.C. § 1202. The primary headings of the HTSUS describe broad categories of merchandise, while its subheadings provide a particularized division of the goods within each category. *Id.*

34. CBP's regulations govern the classification and appraisement of merchandise,

consistent with the HTSUS. 19 C.F.R. § 152.11. ("Merchandise shall be classified in accordance with the Harmonized Tariff Schedule of the United States (19 U.S.C. § 1202) as interpreted by administrative and judicial rulings.").

35. The United States International Trade Commission ("USITC") publishes and maintains the HTSUS consistent with presidential orders. 19 U.S.C. §§ 1202, 3005, 3006; *see also Michael Simon Design, Inc. v. United States*, 33 C.I.T. 1003, 1010 (2009) ("The authority to modify the HTSUS lies with the President"); *Maple Leaf Marketing, Inc. v. United States*, 582 F. Supp. 3d 1365, 1378–79 (Ct. Int'l Trade 2021).

36. When goods enter the United States, CBP is responsible for assessing and collecting any tariffs on those goods, after confirming the HTSUS classification of the goods, according to the rates established by the HTSUS. 19 U.S.C. §§ 1202, 1500, 1502.

### C. Liquidation

37. "'Liquidation' means the final computation or ascertainment of duties on entries for consumption or drawback entries." 19 C.F.R. § 159.1.

38. Typically, when goods enter (*i.e.*, are imported into) the United States, the importer of record pays an estimated duty on the *entry* based on its customs declaration, which asserts a value, origin and HTSUS classification for the imported goods. *See* 9 U.S.C. § 1484. CBP then reviews the customs declaration and may inspect the goods.

39. CBP then fixes the final appraisement of merchandise by confirming the final value, classification, duty rate, and final amount of duty for the imported goods. *See* 19 U.S.C. § 1500.

40. Once the final amount of duty is determined by CBP, CBP "liquidates" the entry and notifies the importer of record as to whether they owe more money or are entitled to a refund. *See* 19 U.S.C. § 1504(b).

41. Liquidation—unless extended—must happen within one year. *See* 19 U.S.C. § 1504(a). Typically, liquidation is done automatically by operation of law. CBP tries to liquidate duties 314 days after the date of entry of the goods and will usually post a notice on its website.

42. CBP has discretion to extend the deadline for liquidation for up to one year pursuant to an importer's request and a showing of good cause. *See* 19 U.S.C. § 1504(b)(2); 19 C.F.R. § 159.12(a)(1)(ii).

43. This Court possesses the equitable authority to suspend liquidation. *E.g.*, *In re Section 301 Cases*, 524 F. Supp. 3d 1355, 1365-66 (Ct. Int'l Trade 2021).

44. Once liquidation has occurred, and *if* the liquidation is protestable, an importer of record has 180 days to file a protest contesting the liquidation, asking the CBP to "reliquidate" the duties. *See* 19 U.S.C. § 1514.[10] But not all liquidations are protestable: where CBP acts in a ministerial capacity (*i.e.*, without discretion) in imposing a duty, the entry's liquidation cannot be protested. *Id.*; *see also Rimco Inc. v. United States*, 98 F.4th 1046, 1053 (Fed. Cir. 2024).

45. This Court and the Federal Circuit have cautioned that an importer may lack the legal right to recover refunds of duties for entries that have liquidated, even where the underlying legality of a tariff is later found to be unlawful. *See In re Section 301 Cases*, 524 F. Supp. 3d at 1365-66; *Target Corp. v. United States*, 134 F.4th 1307, 1316 (Fed. Cir. 2025).

### II. IEEPA does not authorize tariffs.

46. The Challenged Tariff Orders cite IEEPA, 50 U.S.C. § 1701 *et seq.*, the National Emergencies Act, 50 U.S.C. § 1601 *et seq.*, section 604 of the Trade Act of 1974, as amended, 19 U.S.C. § 2483, and 3 U.S.C. § 301 for authority to impose tariffs.

47. None of these statutes authorizes the President to impose tariffs. Of these, it is

---

[10] CBP can also voluntarily reliquidate within 90 days of the liquidation. *See* 19 U.S.C. § 1501.

IEEPA alone that the President and CBP are leaning on to impose and collect the IEEPA duties. IEEPA does not authorize what the Challenged Tariff Orders seek to impose.

48. IEEPA grants the President certain powers, but they "may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared for purposes of this chapter and may not be exercised for any other purpose." 50 U.S.C. § 1701(b).

49. Those powers include the ability to "investigate, regulate, or prohibit" certain transactions in foreign exchange, payments through banks involving foreign countries or nationals, or imports of "currency or securities." 50 U.S.C. § 1702 (a)(1)(A).

50. The President may also control, block, or prohibit the movement or importation of funds or property in which "any foreign country" or foreign national has "interest" in, and which is also subject to the U.S. jurisdiction. 50 U.S.C. § 1702(a)(1)(B).

51. Finally, and only when the U.S. is engaged in "armed hostilities" or has been attacked by a foreign country, the President may "confiscate" property of such a foreign person or country that also is subject to U.S. jurisdiction. 50 U.S.C. § 1702(a)(1)(C).

52. The text of IEEPA does not use the word "tariff" or any term of equivalent meaning.

53. IEEPA was first enacted in 1977 and has been amended several times, but it has never been amended to authorize, or used by any other President to impose, tariffs.

    A.    **The U.S. Constitution vests in Congress—not the President—the power to impose tariffs.**

54. The United States Constitution provides that "[a]ll legislative powers herein granted shall be vested in a Congress of the United States." U.S. CONST. art. I, § 1.

55. The United States Constitution also provides that "Congress shall have Power To

lay and collect Taxes, Duties, Imposts and Excises…" U.S. CONST. art. I, § 8, cl. 3 ("Taxing Clause"), and "[t]o regulate Commerce with foreign Nations." Id., cl. 3 ("Commerce Clause").

56. It has always been understood that tariffs fall within the Taxing and Commerce Clauses.

57. To the extent it is ever permissible under the U.S. Constitution for Congress to delegate any part of the powers vested in it by the Constitution to the President, it must do so, at a minimum, by providing an intelligible principle to direct and cabin the President's authority. *See Fed. Commc'ns Comm'n v. Consumers' Rsch.*, 145 S. Ct. 2482, 222 L. Ed. 2d 800 (2025). In IEEPA, Congress did no such thing. And there is no better evidence of Congress doing no such thing than the pell-mell manner by which these on-again/off-again IEEPA duties have been threatened, modified, suspended, and re-imposed, with the markets gyrating in response.

58. Reading IEEPA as authorizing tariffs would be self-defeating because it would then also require striking down IEEPA as unconstitutional under the nondelegation doctrine for lack of any intelligible principle.

59. Moreover, "[c]ourts expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance." *West Virginia v. EPA*, 597 U.S. 697, 716 (2022) (cleaned up) (*quoting Utility Air Regulatory Group v. EPA*, 573 U. S. 302, 324 (2014)). When Congress has not clearly spoken, courts are directed to find that matters "of vast economic and political significance" are beyond the power of the President. *Biden v. Nebraska*, 600 U.S. 477, 505–06 (2023).

60. By any objective measure, the Challenged Tariff Orders are "of vast economic and political significance." Because IEEPA does not clearly authorize the President to set tariffs—indeed, the statute does not mention the words "tariff" or "duty" and is not even housed

in the same title of the U.S. Code as Congress's actual trade laws (Title 19)—the Challenged Tariff Orders cannot stand and the defendants are not authorized to implement and collect them.

### B. Courts, including this Court, have agreed the IEEPA duties are not authorized.

61. On May 28, 2025, a three-judge panel of this Court granted summary judgment to the plaintiffs in *V.O.S. Selections* and permanently enjoined the government from enforcing the IEEPA duties at issue in that case. That decision was appealed to the Court of Appeals for the Federal Circuit.

62. The Federal Circuit stayed this Court's decision and injunction and ordered an expedited briefing schedule and hearing.

63. Sitting *en banc*, the Federal Circuit issued its decision on August 29, 2025, affirming this Court's decision that the IEEPA duties are unlawful. *See V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312 (Fed. Cir. 2025), *cert. granted*, No. 25-250, 2025 WL 2601020 (U.S. Sept. 9, 2025).

64. In a separate lawsuit filed by a separate group of importers, the U.S. District Court for the District of Columbia held that IEEPA does not authorize tariffs of any sort. *See Learning Res., Inc. v. Trump*, 784 F. Supp. 3d 209 (D.D.C. 2025), *cert. granted before judgment*, No. 24-1287, 2025 WL 2601021 (U.S. Sept. 9, 2025). That decision was appealed to the Court of Appeals for the D.C. Circuit, but before the D.C. Circuit held argument, the United States Supreme Court granted certiorari in both *V.O.S. Selections* and *Learning Resources*. The cases were consolidated, with argument on November 5, 2025.

### III. Plaintiffs paid preliminary IEEPA duties

65. As of the date of this complaint, Plaintiffs have paid IEEPA duties imposed by the Challenged Tariff Orders.

66. Plaintiffs' imports subject to IEEPA entered the United States under new HTSUS codes from foreign countries.

67. Plaintiffs have paid IEEPA duties on a continuous basis.

68. The entries for which Plaintiffs have paid IEEPA duties imposed by the Challenged Tariff Orders are scheduled to begin to liquidate on or after December 15, 2025.

69. Based on Plaintiffs' knowledge and belief, CBP has advised importers that it will not be extending liquidation for entries subject to IEEPA tariffs.

## STATEMENT OF CLAIMS

### COUNT I
### THE CHALLENGED TARIFF ORDERS ARE *ULTRA VIRES* UNDER *V.O.S. SELECTIONS*

70. Plaintiffs incorporate paragraphs 1-69 above by reference.

71. The Court of International Trade in *V.O.S. Selections, Inc. v. Donald J. Trump*, 772 F. Supp. 3d 1350, 1383 (Ct. Int'l Trade 2025), *aff'd*, 149 F.4th 1312 (Fed. Cir. 2025), held that the President exceeded his authority under IEEPA, 50 U.S.C. § 1701 et seq., when he imposed tariffs on imported goods.

72. As the *V.O.S. Selections* Court explained, IEEPA authorizes the President only to "investigate, regulate, or prohibit" certain foreign transactions in times of national emergency; it does not authorize the imposition of tariffs or duties on imports, and neither the text of IEEPA nor its legislative history contains any clear delegation to the President to set tariff rates.

73. The Federal Circuit affirmed this Court's decision, holding that Congress did not clearly delegate to the President the authority to impose the challenged IEEPA duties.

74. The Challenged Tariff Orders are the same as those struck down in *V.O.S. Selections*. They purport to impose duties and modify the Harmonized Tariff Schedule of the

United States solely under IEEPA. For the reasons set forth by the Federal Circuit in *V.O.S. Selections*, the Challenged Tariff Orders exceed the President's statutory authority and are therefore unlawful, void *ab initio,* and without effect as applied to Plaintiffs.

75. Plaintiffs respectfully request that this Court follow the binding precedent of the Federal Circuit, declare the Challenged Tariff Orders unlawful as to Plaintiffs, enjoin CBP from enforcing them as to Plaintiffs, and order CBP to refund all IEEPA duties collected from Plaintiffs, with interest as provided by law.

## COUNT II
## ALTERNATIVE – THE CHALLENGED ORDERS ARE UNCONSTITUTIONAL

76. Plaintiffs incorporate paragraphs 1-75 above by reference.

77. In the alternative, if the Court were to construe IEEPA as authorizing tariffs, the IEEPA Tariff Orders must nevertheless be held unlawful because IEEPA in that event would constitute an impermissible delegation of legislative power from Congress to the President.

78. The U.S. Constitution vests in Congress exclusively the power to "lay and collect … Duties." U.S. CONST. art. I, § 8, cl. 1.

79. Under separation-of-powers principles and binding precedent of the U.S. Supreme Court, Congress cannot delegate its power to the President unless, at the very least, it provides an intelligible principle that directs and meaningfully constrains the President's exercise of that power. IEEPA does not do that.

80. Plaintiffs therefore seek a declaration that the IEEPA Tariff Orders are unconstitutional as to Plaintiffs, enjoin CBP from enforcing them as to Plaintiffs, and order CBP to refund all IEEPA duties collected from Plaintiffs, with interest as provided by law.

## COUNT III
## (DECLARATORY RELIEF, 28 U.S.C. § 2201)

81. Plaintiffs incorporate paragraphs 1-80 above by reference.

82. Federal courts have the power "to declare the rights and other legal relations of any interested party seeking such a declaration." 28 U.S.C. § 2201(a).

83. Plaintiffs' claims present an actual controversy as to the President's authority under IEEPA, the constitutionality of IEEPA, and the authority of CBP to implement and collect the resulting tariffs.

84. Plaintiffs are importers of record and have suffered injury by having been required to pay IEEPA duties as a result of the Challenged Tariff Orders on goods it has imported into the United States.

85. This Court can exercise its equitable power to enter a declaratory judgment that the Challenged Tariff Orders are unlawful for any of the above reasons, and that CBP lacks authority to implement and collect the resulting tariffs, as to Plaintiffs.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

    a) declare that the President lacks authority under IEEPA to set tariffs;

    b) declare that the Challenged Tariff Orders are *ultra vires* and void *ab initio* with respect to Plaintiffs;

    c) declare that, with respect to Plaintiffs, CBP lacks authority to implement and collect any tariffs set out in the HTSUS that are based on the Challenged Tariff Orders;

    d) with respect to Plaintiffs, enjoin CBP from imposing and enforcing any

tariffs set out in the HTSUS that are based on the Challenged Tariff Orders;

e) order the United States to refund to Plaintiffs the IEEPA duties collected on those entries, with interest as provided by law; and

f) award Plaintiffs its reasonable costs, including attorneys' fees, incurred in bringing this action;

g) grant such further relief as this Court deems proper.

Respectfully submitted,

Dated: November 18, 2025

/s/ John Brew
John Brew
Daniel W. Wolff
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Tel. (202) 624-2720
jbrew@crowell.com

*Counsel for Plaintiffs*

-16-